Van Brunt, P. J.
It is not necessary in the disposition of the motion for reargument in this case to recite the facts, which it is admitted were correctly set forth in the opinion delivered by the general term upon the previous appeal herein. The error into which the general term are alleged to have fallen does not seem to have been very flagrant, otherwise the learned counsel for the appellants would not have taken eight years to discover the same. The appeal in respect to which the motion for argument is now made was decided in March, 1878, and the motion for reargument was made in December, 1886. It is assumed as a basis for this motion that the court in the disposition -of the previous appeal overlooked certain provisions of the trust agreement which formed the basis of their opinion. It is conceded that in the statement of facts the terms of the agreement, and of each and every part thereof, were correctly set forth, hue it is claimed in discussing the legal propositions the terms of that agreement were overlooked and an erroneous conclusion arrived at. As has been said, such conclusion cannot have been very apparently erroneous, otherwise a motion to correct the error would not have been delayed for over eight years.
An examination. of the agreement ana of the record before the court upon the previous appeal, leads necessarily to the conclusion that the result then arrived at was entirely correct. It is true that in the declaration of trust executed by Brough at or about the time of the conveyance of the property in question to him, there was a recital that the-Bussell and Erwin Company were to furnish the steel necessary for the use of the enterprise, and that there was a provision also for the payment to that company for the steel thus- furnished, and if the Bussell and Erwin Company had furnished the steel pursuant to that declaration of trust, with knowledge of its terms, they would undoubtedly have been remitted to the order of payment therein provided. But it is part and parcel of the proof that the Bussell and Erwin Company knew nothing of the terms of this instrument, and were therefore not bound thereby unless they chose to accept the same. It is also the fact that the Bussell and Erwin Company were the parties who sold all the goods manufactured by the Douglas Manufacturing Company during this period, and that at the end of this enterprise they and the defendant Flint received by conveyance from Brough the *312 whole of the property in question. Brough was carrying on this business, and the Russell and Erwin Company were his sales agents. The Russell & Erwin Company knew that for the production of the merchandise which they sold as the agents of this enterprise, raw material was necessarily required, and that if they did not furnish it, somebody else must be furnishing it upon the credit of the enterprise. It would, therefore, seem apparent that the enterprise there conducted should be required to pay the expenses and indebtedness incurred in the running of the business before the property could be applied to the payment of claims existing at the time of the commencement hereof. The plaintiffs in this action, therefore, having supplied the material for the conduct of this business had a right to claim that the property represented by the enterprise in question should be applied to the payment óf their debt, such debt being a part of the obligations arising from the conduct of the business, before the property could be applied to the payment of debts which did not arise from the prosecution of the business claimed to have been conducted under the trust deed. It is immaterial, so far as the result is concerned, whether such indebtedness be considered as-part of the expenses of the business, as mentioned in the-trust deed, or whether the rights of the plaintiffs are to be enforced simply as creditors of the enterprise. The result would be precisely the same, as they would be entitled to be paid for the merchandise furnished by them, before the capital used in the enterprise should be applied to the payment of any debts not arising out of the business.
The next question to be considered arises upon the objections taken to the report of the referee.
The issue which was referred to the referee to hear and determine, was that which arose by the answers of the defendants claiming that the steel referred to, and which formed the subject matter of the plaintiff’s claim in this action, was defective and bad in quaiity. After a long trial of these issues before the referees,-extending from June, 18J8, to June, 1885, and after the taking of a large mass of testimony, the learned referees came to the conclusion that the defendants had failed to show that the steel was defective and of bad quality and not worth the amount claimed by the plaintiffs. The evidence upon this point was conflicting, and unless good reasons have been shown, the conclusions arrived at by the learned referees ought not to be disturbed.
The principal ground upon which the conclusion of the. referees has been attacked is the statement in their opinion that the defendants’ case was made so strong that it disproved itself; and some dissatisfaction seems to have been. *313 expressed by the learned counsel in that the referees failed to properly characterize the testimony offered upon the part of the defendants. It may be that the learned referees have dealt too leniently with some of the testimony offered upon the part of the defendants; but the grounds upon which that testimony seems to have been discredited, are apparently well founded.
The learned referees suggest that the proof upon which the defendants rehed to establish their defense consisted of three classes:
First. The test, by chemical analysis, of bars of steel, which, it was claimed, were specimens of the steel furnished by the plaintiffs to the works.
Secondly. Practical tests m working bars of steel, claimed to be part of that furnished by the plaintiffs to the works, by experienced workmen, and
Thirdly. The testimony of the superintendents and employees at the works as to the manner in which the steel acted in working it up into tools, and the waste and loss occasioned by breakage or the development of defects fatal to the quality of the tools m the course of manufacture. It is conceded that the evidence produced on the part of the defense to sustain their defense if it were credited, and if full effect were given it, would wipe out the whole of the plaintiffs’ present claim, and show that the loss which the business must have sustained on account of the defects in the steel exceeded, by a considerable sum, the amount claimed by the plaintiffs m this action.
In the consideration of this question the learned referees considered the conceded facts and the written evidence to-be of greater weight than oral testimony given a considerable time after the happening of the events in question. There was a correspondence going on between the plaintiffs and the parties using and manufacturing the steel in question, at the works conducted by Brough, during the whole period in which this steel was being furnished.
James Swann, the superintendent at Seymour, testified, upon behalf of the defendants, that the character of the steel was not suitable for their business, and that it was not-uniform in temper, and that the loss which previously had not been more than three, and sometimes did not average more than one per cent, became twenty-five per cent when the Gautier steel was used. This witness, we find, on the 3d of March, 1873, writing to the plaintiffs' that the steel worked well so far; and on the sixth of March to the same effect; on the twenty-seventh of March to the same effect; on the nineteenth of April to the same effect, and on the ninth *314 of June he says: “ The steel for tools works very well so far as we have tried.”
On the nineteenth of July he gives an order for steel the same as we have had. On the thirtieth of October Swann wrote complaining of some steel which had been sent, and on the tenth of November, in answer to that letter, Mr. Charles Douglas, who had charge of this business for the plaintiffs, wrote: “ It is the first complaint we have had of the kind ” and as all the steel you have had for farriers from.the first has been made from the same stock and in the same manner, we are at a loss to account for the trouble. ” Swann does not seem to have made any further complaint, and on the 9th of June, 1874, he writes to the plaintiffs an order: “Please send the same quality of steel .as last, as soon as you can.”
. Letters were also produced written by Mr Eddy commending the quality of the steel in August, 1873, after there had been twenty-four or twenty-five tons of such steel delivered. He says, “we find by working it that the tools prove, to be of excellent quality. The tool will stand as severe a test as any made from any other steel we have ever used. The steel requires a little more care in heating. There is also less loss of stock from cracking of tools in hardening than when we used Ferths steel.” In another letter as late as February, 1874, he orders from the plaintiff “steel of the same quality as the former steel.” This correspondence went on during the whole course of the business, and the learned referees well say that it appears from this correspondence that the manufacturers went on from month to month and week to week during this period ordering this steel for the works in apparent ignorance that it was "wholly unfit for the purposes for which it was designed.
The referees came to the conclusion, and it would appear justly so, that this approval of the steel by the manufacturers using it during the course of their manufacture was entitled to greater weight than oral testimony given by workmen where opportunity for cross-examination was not had, and where in some instances such testimony was totally inconsistent with the letters produced, written by the witnesses themselves.
There is another pregnant fact and that is, that over $300,000 worth of manufactured tools per year were received by the Russel & Erwin Company for sale, .and there is no proof going to show that any large amount of those tools were ever returned by purchasers. There is some general evidence given upon this point, but it is not specific and seems to be entirely unreliable. It appears from the testimony of the witness McLaughlin, that in the matter of *315 chisels the quantity at invoice price received from this enterprise was certainly $60,000 worth and the whole remaining on hand was less than $300 worth. The learned referees rightly considered testimony of this character entitled to greater weight than the evidence of workmen showing the steel to be of such bad quality that it was impossible that any great part of it could ever have been marketable.
The test by chemical analysis tended to show that the steel was of a very inferior character, and totally unfit for the manufacture of marketable tools. These tests were made two years after the period at which the steel was furnished, and while the works were in the chaige of the defendants; and the referees concluded from the facts hereinbefore set forth that it was impossible that the steel tested by chemical analysis could have been fair samples of the steel furnished by the plaintiffs to the works. In support of that finding, we find from the testimony of the witness Cullen that the scrap steel used at these manufacturies was, in February, 1876, all mixed together, and that one kind could not be distinguished from another. The witness Clearwater also testified that in the early part of the year 1876 various kinds of steel were all put together, including the Gautier steel, Black Diamond, and Ferths. And it appears that it was from this pile of steel that the samples were taken for the purposes of the chemical analysis.
It is true that the witnesses upon the part of the defendants swear that the steel which was experimented upon was Gautier steel, and that there was no other steel in the building. But the question as to whether the steel experimented upon was a fair sample of the Gautier steel was to be determined by the learned referees upon this conflict of evidence; and it would seem that the conceded facts in regard to the sales of manufactured goods, and the continuance of the orders for the steel without complaint, in con nection with the testimony of Clearwater and Cullen, were sufficient to justify them in coming to the conclusion that there was some error committed in selecting the steel which was subjected to chemical analysis.
It is claimed that the testimony of defendants’ witnesses in regard to the identity of the steel was of such a character that the referees were bound in law to accept it as true; and authorities are cited, where witnesses are unimpeached and the facts sworn to by them uncontradicted, either directly or indirectly by other witnesses, neither a court nor a jury can in the exercise of a sound discretion, disregard their testimony. The fact that the witnesses in question have been contradicted both by oral and written testimony *316 seems to have been entirely overlooked in the submission of this proposition.
We are of opinion, therefore, that the referees had ample evidence on which to found their conclusions; and that instead of such conclusions being against the weight of evidence as presented by this record, they seem to be in harmony with the preponderance of proof.-
The judgment and order appealed from should therefore be affirmed.
Brady and Daniels, JJ., concur.